1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SUSAN GOETZ,

                                    Plaintiff,

        vs.

JO ANNE B. BARNHART,

                                    Defendant.

CASE NO. 05cv1069 BTM(JMA)

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

        Plaintiff Susan Goetz seeks judicial review of a final decision by the Commissioner of Social Security denying her husband's application for Disability Income Benefits under Title II of the Social Security Act.  Plaintiff and Defendant have filed cross-motions for summary judgment.  For the reasons discussed below, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion for summary judgment is **DENIED**.

## I. PROCEDURAL HISTORY

        On June 21, 2000, Lawrence Goetz ("Goetz") protectively filed an application for Title II benefits.  Disability is alleged regarding the time period from February 15, 1999 through February 9, 2002, on the basis of neck and back injury, tinnitus, upper extremity numbness, left ankle pain, right knee pain, and depression.

        In a decision dated August 30, 2001, Administrative Law Judge Larry B. Parker (the

1

"ALJ") denied Goetz's application.  (Tr. 69-75.) The ALJ concluded that although Goetz suffered from severe impairments and could not perform his past relevant work, he retained the residual functional capacity to perform a significant range of light work.

On appeal, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  (Tr. 79-80.)  The Appeals Council noted that it had received additional evidence regarding medical treatment of Goetz's left ankle and right knee and concluded that further evaluation of Goetz's musculoskeletal impairments and his residual functional capacity was necessary.

On January 31, 2002, Goetz sought medical treatment for severe headaches.  (Tr. 527.)  A CT scan and MRI of Goetz's brain revealed a right temporoparietal brain tumor.  (Tr. 529.)  On February 6, 2002, Goetz underwent surgery for removal of the tumor.  Shortly thereafter, Goetz suffered a brain hemorrhage and passed away on February 9, 2002.  (Tr. 559.)

In a decision dated March 14, 2003, the ALJ denied Goetz's application.  (Tr. 22-32.) The ALJ rejected Goetz's allegations with respect to the degree of his impairments and limitations and found that Goetz had the residual functional capacity to perform the jobs of clear optical lens assembler and final assembler and packager.

Plaintiff requested administrative review of the ALJ's decision, but the Appeals Council denied the request.  Plaintiff timely sought judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## II.  MEDICAL BACKGROUND

Goetz was involved in two separate car accidents in 1998.  After the second accident, he stopped working.

During the relevant time period, Goetz was treated for degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, hearing loss, depression, and knee and ankle pain.  (Tr.163-527.)  Goetz's complaints consisted of persistent tinnitus, low back pain radiating to his legs, neck pain radiating into his shoulders and into his extremities,

numbness and tingling bilaterally, bilateral knee pain, and depression.  (Id.)  He was seen by multiple physicians, including primary physicians, the pain clinic, orthopaedic surgeons, neurologists, and spine surgeons.  (Id.)

A.    Pain and Numbness

According to MRI studies taken in April 1999, multilevel disk degeneration was present in Goetz's lumbar spine.  (Tr. 430.)  However, no existing nerve roots were clearly deflected. (Tr. 431.)  Disk degeneration and spondylosis were also present in Goetz's cervical spine. (Tr. 428.)  According to Dr. Reicher, the MRI showed borderline deflection of the ventral right C6 nerve root, borderline deflection of the ventral C6 nerve roots bilaterally and very slight deflection of the left C8 nerve root.  (Id.)

On March 6, 2000, Goetz underwent a right carpal tunnel release.  (Tr. 224.) However, the surgery did not alleviate the symptoms Goetz experienced in his hand.  (Tr. 511; 571-73.)

On September 10, 2001, Goetz underwent right knee arthroscopy and chondroplasty, as well as removal of an implant of the right ankle.  (Tr. 460.)  According to Mrs. Goetz, the knee surgery went well.  (Tr. 629.)

As for non-surgical medical treatment, in 1999, Goetz received a series of steroid injections. (Tr. 175-89.)  The injections afforded minimal relief and Goetz continued to be in pain. (Id.)   Goetz also participated in a pain management program and took Lorcet.  (Tr. 191-303.)  Goetz's primary pain medication was Lorcet.  (Id.)

Almost uniformly, Goetz's doctors found that the clinical findings did not account for the degree of pain Goetz experienced in his back or neck or for the peripheral symptoms, such as the radiating pain and the bilateral numbness and tingling. In his July 14, 1999 report, Dr. Hawkins concluded, "The findings on magnetic resonance imaging study do not appear to represent significant enough pathology to account for the patient's multiple problems, rather I believe that he is suffering primarily from myofascial pain syndrome and associated cervical tendinitis."  (Tr. 298.)

3

1    In September 1999, Dr. Riedler similarly concluded, "I do not feel that any of the

2  patient's symptoms are likely due to nerve root impingement at any level of the spine." (Tr.

3  284.)  Dr. Riedler opined that the MRI was not consistent with weakness or tingling of the

4  hands.  (Id.)  In addition, the neck pain did not have any "clear cut neurological etiology," and

5  Dr. Riedler had "a hard time explaining the apparent sensory deficits in the lower

6  extremities."  (Id.)

7    In his May 15, 2000 report, Dr. Pye noted, "I find no objective physical or radiographic

8  findings to account for Mr. Goetz' peripheral symptoms.  His cervical spondylosis certainly

9  could be consistent with neck pain per se."  (Tr. 214.)

10    In December 2000, Dr. Kaufman wrote, "I do not see [a] discreet [sic] anatomic cause

11  for his symptoms."   (Tr. 370.)   As a result, Dr. Kaufman did not have any further

12  recommendations regarding treatment.

13    In his August 2001 report, Dr. Meyer concluded that Goetz was a very poor surgical

14  candidate because he "consistently has pain that is fairly out of proportion to his examination

15  findings." (Tr. 514.)  Dr. Meyer explained to Goetz that he was going to have to learn to live

16  with a lot of his pain and recommended that he try to get involved in physical activity, whether

17  it be a walking program, stationary bike, or swimming.  (Tr. 516.)

18    In October 2001, Dr. Wallace opined, "It is unlikely that any type of injection therapy

19  would benefit him.  Given the multiple treatment failures for this patient and given the diffuse

20  nature of the pain, I can only recommend chronic opioid management."  (Tr. 453.)

21

22  B.    Tinnitus

23    Goetz complained that he suffered from "very loud ringing" in his ears that made it

24  difficult for him to concentrate.  (Tr. 138, 156.)  At times, the tinnitus was his worst problem.

25  (Tr. 262, 271.)

26    On April 27, 1999, Goetz underwent audiometric testing due to concerns regarding

27  his tinnitus and hearing loss.  The tests revealed normal hearing from 250 Hz to 2000 Hz with

28  a precipitous moderately severe high frequency sensorineural hearing loss bilaterally.  (Tr.

170.)

In his report, Dr. Meyer noted that Goetz had apparently seen multiple head and neck surgeons for his tinnitus but refused to be evaluated by the head and neck surgery department at UCSD.  (Tr. 513.)  There is no other record of tests or treatment for the tinnitus.

C.     Depression

On December 6, 2000, Goetz underwent a mental examination.  He was diagnosed as suffering from major depression.  (Tr. 382.)  He was treated with Zoloft, Lorcet, and Trazadone.  (Tr. 376-82.)  It appears that he experienced a slight improvement as a result of his treatment.  (Id.)

**III . STANDARD**

The Commissioner's denial of benefits may be set aside if it is based on legal error or is not supported by substantial evidence.  Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance.  Id. Substantial evidence is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

**IV.  DISCUSSION**

Plaintiff argues that the ALJ erred by rejecting Mr. Goetz's subjective complaints and by disregarding the testimony of Mrs. Goetz.  The Court reverses and remands on other grounds.

Under the Social Security Regulations, the determination of whether a claimant is disabled within the meaning of the Social Security Act is a five step process.  The five steps are as follows: (1) Is the claimant presently working in any substantially gainful activity?  If so, then the claimant is not disabled.  If not, then the evaluation proceeds to step two. (2) Is

5

the claimant's impairment severe?  If not, then the claimant is not disabled.  If so, then the evaluation proceeds to step three.  (3) Does the impairment "meet or equal" one of a list of specific impairments set forth in Appendix 1 to Subpart P of Part 404?  If so, then the claimant is disabled.  If not, then the evaluation proceeds to step four.  (4) Is the claimant able to do any work that she has done in the past?  If so, then the claimant is not disabled. If not, then the evaluation proceeds to step five.  (5) Is the claimant able to do any other work?  If not, then the claimant is disabled.  If, on the other hand, the Commissioner can establish that there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The ALJ determined that (1) Goetz had not engaged in substantial gainful activity since February 15, 1999; (2) Goetz had a severe back injury, tinnitus, upper extremity numbness, depression, neck injury, left ankle pain, and right knee pain; (3) Goetz's impairments did not meet or equal the listed impairments in Appendix 1, Subpart P of Part 404; (4) Goetz was unable to perform his past relevant work as a carpenter; and (5) Goetz was able to perform the jobs of clear optical lens assembler and final assembler and packager, both of which exist in significant numbers in the national economy.

In reaching his determination that Goetz was not disabled, the ALJ rejected Goetz's allegations of the degree of his impairments, symptoms and limitations.  The ALJ found Goetz not credible for the following reasons: (1) Goetz's symptoms were not fully explained by clinical signs or laboratory findings of record in terms of medically determinable impairments likely to produce the degree of symptomology alleged; (2) no physician of record opined that Goetz exhibited disabling limitations lasting or expected to last for any continuous period of at least 12 months; (3) Dr. Yu, the medical expert, testified that during the period at issue, Goetz was able to perform work-related activities within the parameters discussed in the ALJ's decision; (4) the state agency program physicians opined that during the period at issue Goetz was able to perform a range of light work; (5) the evidence indicates that Goetz responded to some degree to pain medications; (6) no physician of record has stated

1   that Goetz was precluded from the performance of sedentary work during the period at issue;

2   and (7) despite the claimant's symptoms, Dr. Meyer recommended that Goetz engage in

3   physical activities including swimming, bicycling, or a walking program.

4          A number of the reasons proffered by the ALJ are invalid.  Although the treating

5   physicians did not say that Goetz was *precluded* from performing sedentary work during the

6   period at issue, they did not say that he *could* perform such work.  Dr. Meyer stated that "the

7   odds that he goes back to work after being out for three years and being in this much chronic

8   pain are extremely low, and I was quite frank with him, discussing this with him."  (Tr. 515.)

9   Dr. Meyer suggested that Goetz *try* to engage in physical activities as a way of living with his

10  pain, but there is no evidence that Goetz actually went swimming, biking, or walking.

11  Furthermore, although Goetz responded in some degree to pain medications, he still

12  experienced chronic pain and sought treatment for such pain.

13         The only potentially valid reason for rejecting Goetz's subjective complaints is that

14  there was no diagnosed anatomic cause for his symptoms.[1]  The state agency physician and

15  Dr. Yu relied on the *objective* medical findings in reaching their opinions that Goetz could

16  perform some work.

17         However, it appears that there may have been a medical cause for Goetz's multiple

18  symptoms after all.  After the Appeals Council vacated the initial decision by the ALJ and

19  before the ALJ held the hearing upon remand, Goetz was diagnosed with a brain tumor (a

20  glioblastoma multiforme) and passed away.  At the hearing, the ALJ noted that the brain

21  tumor might have been the underlying cause of some of Goetz's symptoms: "I"m not a

22

23         [1]  In deciding whether to accept a claimant's subjective symptom testimony, an ALJ
    must perform two stages of analysis.  See Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996).
24  The first stage of analysis is a threshold test set forth in Cotton v. Bowen, 799 F.2d 1403 (9th
    Cir. 1986).  Under this test, the claimant must (1) produce objective medical evidence of an
25  impairment or impairments; and (2) show that the impairment or combination of impairments
    could reasonably be expected to produce some degree of symptom.  Id. at 1407-08. If the
26  claimant satisfies the Cotton test and there is no evidence of malingering, the ALJ can reject
    the claimant's testimony about the severity of his symptoms only by offering specific, clear
27  and convincing reasons for doing so.  Smolen, 80 F.3d at 1281.  The ALJ must state
    specifically which symptom testimony is not credible and what facts in the record lead to that
28  conclusion.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Whether the ALJ's findings
    were supported by substantial evidence in this regard need not be decided by the Court at
    this time because the case will be remanded.

doctor, but from over the years in hearing testimony, vision and headaches and other problems are sometimes the product, or a subsidiary collateral derivative from the brain tumors." (Tr. 630.) Plaintiff's attorney also touched upon the role the brain tumor might have played in Plaintiff's pain:

> Well I kind of look at it as, you know, there's been complaints of pain and numbness and burning in the extremities.  And nobody could figure it out. . . . And it's a little bit more in excess than the objective findings were.  And then when I got the UCSD records, and it talks about the tumor, encircling part of the brain.  I kind of said well maybe that was why he was having such significant pain levels.

(Tr. 638.)

The ALJ responded that since the remand was for orthopedic issues and there was no internal medicine specialist present, the ALJ would take the matter of the brain tumor under advisement.  (Tr. 638.)  The ALJ explained that he would determine whether it was necessary to have another hearing with an oncologist or send out interrogatories.  (Tr. 637-38.)

There is no evidence in the record that the ALJ made any further inquiries regarding the possible effects of Goetz's brain tumor.  The ALJ's decision does not identify any actions taken by the ALJ to develop the record regarding whether the brain tumor may have contributed to Goetz's symptomology.

Although the remand focused on orthopedic issues relating to Goetz's ankle and knee, the remand did not preclude the ALJ from reevaluating Goetz's pain allegations and developing the record where necessary.  Upon remand, an ALJ "shall take any action that is ordered by the Appeals Council *and may take any additional action that is not inconsistent with the Appeals Council's remand order.*"  20 C.F.R. § 404.977(b) (emphasis added).  See Campbell v. Bowen, 822 F.2d 1518 (10th Cir. 1987) (holding that the ALJ's redetermination of the claimant's residual functional capacity was not inconsistent with the Appeals Council's order remanding the case and directing the ALJ to obtain testimony from a vocational expert as to the transferability of the claimant's skills to a range of work within the claimant's residual functional capacity).  The Appeals Council vacated the ALJ's decision in its entirety and did not limit the scope of the remand.

The ALJ has "a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting Smolen, 80 F.3d at 1288). The ALJ may fulfill his duties in a number of ways, including subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. Id. See also 20 C.F.R. §§ 404.944, 404.950 (d)(1), 404.1512(e).

After learning that Goetz was eventually diagnosed with a brain tumor, the ALJ had a duty to conduct an inquiry regarding the potential relationship between the brain tumor and Goetz's subjective complaints. The fact that Goetz had a glioblastoma multiforme brain tumor raises substantial questions regarding whether Goetz's symptoms – particularly his diffuse pain, numbness and tingling in his extremities, weakness, tinnitus, and vertigo – were caused in whole or in part by the brain tumor. Indeed, the ALJ acknowledged that the brain tumor may have played a role in Goetz's symptoms.

However, it appears that the ALJ did not conduct any inquiry regarding the possible effects of the brain tumor. The ALJ's failure to do so constitutes legal error and necessitates the remand of this case.

Upon remand, the ALJ shall conduct an inquiry into whether Goetz's brain tumor could have caused some or all of his symptoms during the relevant period and, if so, shall reevaluate the credibility of Goetz's subjective complaints. The ALJ shall also evaluate how Goetz's tinnitus, in combination with his other impairments, affected his ability to work.[2]

--------

[2] Goetz complained that his tinnitus was a "major distraction" that made it difficult for him to concentrate. (Tr. 138, 156.) His wife also reported that his tinnitus caused concentration problems. (Tr. 150.) During the hearing on July 11, 2001, Dr. Yu said that he did not want to comment on Goetz's complaints of tinnitus. The ALJ responded, "It's not a must." The ALJ did not conduct any further inquiry into the tinnitus. In his decision, the ALJ did not specifically address the issue of Goetz's tinnitus and did not evaluate how the tinnitus (lack of concentration) would affect Goetz's ability to work.

# V.  <u>CONCLUSION</u>

For the reasons discussed above, Plaintiff's motion for summary judgment [9-1] is **GRANTED** and Defendant's motion for summary judgment [13-1] is **DENIED**.   The Court **VACATES** the ALJ's decision and **REMANDS** the case pursuant to the fourth sentence of § 405(g) for further findings consistent with this opinion.   The Court does not reach the question of whether the existing record supports the ALJ's decision.

**IT IS SO ORDERED.**

DATED:  January 24, 2007

Hon. Barry Ted Moskowitz
United States District Judge

05cv1069 BTM(JMA)